**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

---

**PATRICIA MAANI-FOGELMAN,**

**Plaintiff,**

**v.**

**GUTHRIE MEDICAL GROUP, P.C.,**

**Defendant.**

---

**CIVIL ACTION NO. _____**

**JURY TRIAL DEMANDED**

---

## COMPLAINT AND JURY DEMAND

Plaintiff Patricia Maani-Fogelman, by and through her attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint"):

## PRELIMINARY STATEMENT

1.       This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Patricia Maani-Fogelman ("Dr. Maani-Fogelman"), the former Director of Palliative Care at Defendant Guthrie Medical Group, P.C. ("Defendant" or "Guthrie"). Dr. Maani-Fogelman has been harmed by Defendant's discrimination and harassment based on her sex and race and retaliation for Dr. Maani-Fogelman's complaints about discrimination and harassment. Dr. Maani-Fogelman has also been harmed by Defendant's breach of contract, failure to pay her earned wages in violation of the Pennsylvania Wage Payment and Collection Law, unequal pay in violation of the Equal Pay Act ("EPA"), retaliation for complaints Dr. Maani-Fogelman raised about unequal pay in violation of the EPA, and fraudulent inducement, culminating in her constructive discharge on June 22, 2022.

2.       This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), the

Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, et seq. ("WPCL"), the Equal

Pay Act, 29 U.S.C. § 206(d) ("EPA"), and Pennsylvania common law.

### JURISDICTIONAL STATEMENT

3. This Court has original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4),

which grants the District Court original jurisdiction in any civil action authorized by law to be

commenced by any person to recover damages to secure equitable or other relief under any act of

Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over any Pennsylvania state law claims

pursuant to 28 U.S.C. § 1367.

6. All conditions precedent to the institution of this suit have been fulfilled. On

October 17, 2022, Plaintiff timely filed a Charge of Discrimination with the United States Equal

Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the

Pennsylvania Human Relations Commission ("PHRC").  On January 25, 2023, the EEOC issued

a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of

Plaintiff's receipt of said Notice.[1]

### VENUE

7. This action properly lies in the Middle District of Pennsylvania, pursuant to 28

U.S.C. § 1391(b).

---

[1] Plaintiff dual-filed her Charge of Discrimination as a Complaint with the PHRC on October 17, 2022, less than one year ago, for Defendant's violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").  Dr. Maani-Fogelman will seek to add her PHRA claims once it has been more than one year since she dual-filed her EEOC Charge as a Complaint with the PHRC.

8.      This action properly lies in the Middle District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendant in this judicial district.

## PARTIES

9.      Plaintiff Patricia Maani-Fogelman is an adult, female, Asian American of Indian descent, who is a citizen and resident of Boalsburg, Pennsylvania and the United States of America

10.     Defendant Guthrie Medical Group PC, located at One Guthrie Square, Sayre, Pennsylvania, is a medical group practice offering care in multiple specialties, including palliative care.

11.     At all relevant times, Defendant Guthrie is and has been an employer employing more than five hundred (500) employees.

12.     Defendant Guthrie does significant business within the Commonwealth of Pennsylvania.

13.     At all relevant times, employees of Guthrie acted as agents and servants for Guthrie.

14.     At all relevant times, employees of Guthrie were acting within the scope of their authority and in the course of employment under the direct control of Guthrie.

15.     At all times material hereto, Guthrie acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Guthrie and in furtherance of Guthrie's business.

16.      At all times relevant hereto, Defendant is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

17.      At all relevant times hereto, Plaintiff Patricia Maani-Fogelman was an "employee" within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

18.      This Honorable Court has jurisdiction over Defendant.

## **FACTS**

19.      Dr. Maani-Fogelman is a highly experienced healthcare provider with a stellar reputation in the field of palliative medicine.

20.      Given Dr. Maani-Fogelman's expertise and knowledge, Guthrie recruited Dr. Maani-Fogelman in August and September 2018.

21.      During this time, however, Dr. Maani-Fogelman had received a very favorable offer as a Staff Nurse Practitioner elsewhere, and had a very lucrative and fulfilling job at that time.

22.      Dr. Omar Yumen, MD, Co-Chairman, Cancer Service Line, reached out to Dr. Maani-Fogelman, a former Geisinger colleague, and asked her to meet with the leadership at Guthrie regarding this opportunity before committing to the other organization.

23.      Dr. Maani-Fogelman was told that she was being offered a director position, even though it was typically a physician role, on the grounds that the Executive Leadership had all been impressed by her experience and that she was the best candidate that they had seen (even as compared to several physician candidates).

24.     Thus, it was clear that Guthrie was aware that the most important qualification of the director position was not whether the incoming director was a physician, but rather the experience the individual had in the field.

25.     Despite this clear recognition of Dr. Maani-Fogelman's exceptional skills and expertise, even from the beginning of her discussions with Guthrie, as a woman of color, Dr. Maani-Fogelman faced repeated obstacles and difficulties negotiating an appropriate salary and benefits for the Medical Director position Guthrie recruited her for.

26.     Although the expected salary for such a role would typically be in the $300,000 range, Dr. Maani-Fogelman was informed that, as a "non-physician," Guthrie would only consider offering a salary in the $200,000 range.

27.     Although Dr. Maani-Fogelman reminded Guthrie that a salary of $225,000-$250,000 would be more than fair, given the rural location, her experience, training and education, and the work they needed to get done, she agreed to accept the position for a salary in the range of $200,000 to $225,000.

28.     Tellingly, however, despite refusing to give Dr. Maani-Fogelman the higher salary because she was not a "physician," Dr. Maani-Fogelman would be performing exactly the same work and was specifically recruited for the position over physicians due to her exceptional skill and experience.

29.     Dr. Maani-Fogelman was also initially given a benefits package intended for advanced staff practice providers, and had to remind the Human Resources Representative that she should be given the benefits given to every other medical director.

30.     Dr. Maani-Fogelman was also offered insufficient vacation time, only two weeks, when a minimum of four weeks' vacation was a professional standard.

31.     Notably, Dr. Maani-Fogelman had begun employment with her former employer Columbia with 6 weeks' vacation and her former employer Geisinger with 4 weeks' vacation, which had increased to nearly 6 weeks at the time of her departure.

32.     Despite Dr. Maani-Fogelman's efforts and repeated requests, including her reminding Guthrie that at least four weeks' vacation was a routine and standard offer for a Medical Director position, her request was denied by Dr. Michael Scalzone, MD, Executive Vice President/Chief Quality Officer and Chair, Compensation Committee.

33.     Dr. Scalzone informed Dr. Maani-Fogelman that she would begin her employment with only two weeks' vacation time, and if she wanted more, she would have to build it up over time and years of service.

34.     Tellingly, other new providers who began at the same time as Dr. Maani-Fogelman were given more vacation time than the two weeks allotted to Dr. Maani-Fogelman.

35.     Notwithstanding the proper range of salary for the position, and Dr. Maani-Fogelman's stance of her appropriate salary in the $225,000-$250,000 range, the initial offer made to Dr. Maani-Fogelman was a salary of $130,000, which she declined.

36.     The offer was ultimately raised to $160,000.

37.     Dr. Maani-Fogelman could not accept these low offers for a Medical Director position, since it was only slightly higher than what she had been making at the time as a Staff Nurse Practitioner, and it was lower than what she had been offered for a Staff Nurse Practitioner position at another company.

38.     Ultimately, to induce Dr. Maani-Fogelman to leave her then-current position, decline the other offer, and accept employment with Guthrie with the $160,000 baseline salary, Guthrie promised and represented to Dr. Maani-Fogelman that her annual salary would include

certain guaranteed bonuses every year of her employment, as well as additional benefits and promises of improvements to her base salary once she began employment.

39.     Thus, the expectation was that Dr. Maani-Fogelman would earn close to $200,000 in her first year of employment, which was expected to grow each year.

40.     In December 2018, Dr. Maani-Fogelman received the letter enclosing her employment contract, with her title as "Director of Palliative Care," and stating that it would include the "base salary as discussed" with "[d]etails to be finalized with Dr. Lowry."

41.     The employment agreement attached to the letter states that, in addition to base salary and other benefits, Dr. Maani-Fogelman was to receive a retention bonus "at the beginning of years 2 and 3" and would be eligible for a clinical bonus annually, based on certain metrics that would be "developed with the Co-Director of the Oncology Service Line."

42.     The clinical and performance goals for each year were agreed to in or about December 2018 and January 2019, between Dr. Maani-Fogelman and Dr. Lowry, Dr. Brian Filippo, MD, Chief Medical Officer, and Dr. Scalzone.

43.     Moreover, in Appendix B of the Agreement, marked "Compensation Plan," it indicates that, for Year 1, Dr. Maani-Fogelman's total compensation would be $190,000, which consisted of a base salary of $160,000, retention bonus of $10,000, and clinical bonus of $20,000; Year 2 would be "$160,000 + clinical bonus" (set forth as $25,000) plus a $10,000 retention bonus; and Year 3 would be FMV of base salary, plus $10,000 retention bonus and $25,000 clinical bonus.

44.     These documents demonstrate that Dr. Maani-Fogelman's bonuses were guaranteed and that her minimum total compensation was $190,000 for the first year and was to be increased thereafter.

45.     Based on the representations made by Guthrie, upon which Dr. Maani-Fogelman reasonably relied, Dr. Maani-Fogelman submitted her resignation to her former employer, Geisinger, and began her employment with Guthrie on April 1, 2019.

46.     Immediately upon beginning her employment, Dr. Maani-Fogelman observed that she was the only female, non-Caucasian medical director at Guthrie Medical Group Sayre, the only non-Caucasian female in leadership at that time and, at the time of her hire, she was the only non-Caucasian medical director at Guthrie.

47.     Moreover, upon her arrival, Dr. Maani-Fogelman discovered that several of the promises made to her regarding terms and conditions of her employment had not materialized.

48.     For example, Dr. Maani-Fogelman was not given an office, but instead, was placed into a shared office with a nurse practitioner and social worker.

49.     In addition, Dr. Maani-Fogelman was not given any of the designated space or materials that she was promised would be provided for her.

50.     Specifically, although Dr. Maani-Fogelman was given a desk at Guthrie, it was irreparably damaged, as the cabinet doors and drawers did not close, the desk wobbled, the hutch was not attached to the desk, and there were no keys given to secure documents or belongings.

51.     Dr. Maani-Fogelman was assured that she would receive a new desk, but, even after years of employment at Guthrie, she did not receive a new desk until November 2021, and then only after she had to tape the cabinet door on the hutch shut with electrical tape after repeated occasions where it popped open and hit her in the head.

52.     Dr. Maani-Fogelman also was not given any business cards or even a lab coat.

53.     Moreover, the Operations Manager appeared surprised by Dr. Maani-Fogelman and stated that she had been overwhelmed with other work but would try to figure out an office space situation.

54.     This did not occur for several months.

55.     Dr. Maani-Fogelman was also incorrectly listed in Guthrie directories as "nurse practitioner, cancer treatment center" despite being hired as the Director of Palliative Care.

56.     Despite reporting this error several times, it was never corrected during her employment with Guthrie.

57.     In the meantime, however, Dr. Maani-Fogelman was expected to build a program, develop templates, order sets, create a curriculum for residency training and build partnerships with stakeholders across the system while working in a cramped office space without any privacy for ongoing administrative conversations.

58.     After Dr. Maani-Fogelman had begun her employment, she learned that Dr. James Perle would also be joining Guthrie to work in Palliative Care.

59.     In April 2019, she was cc'ed on an email from Fred Bloom, President of the Guthrie medical group, in which he advised his assistant to put together a package for Dr. Perle with an annual salary of $250,000, plus a bonus of $25,000 per year, and four weeks' vacation – and thus significantly more than what Dr. Maani-Fogelman – the Medical Director for Palliative Care – had been offered and was earning.

60.     Dr. Perle began working with Palliative Medicine at the Sayre facility two days per week beginning in September 2019 and repeatedly complained about the Sayre facility, including that the facility was inconvenient and that he did not like the hospital or its providers.

61.     The following day, on April 27, 2019, Dr. Maani-Fogelman expressed her concerns with Dr. Lowry regarding the significant salary inequity between herself and Dr. Perle.

62.     These discussions with Dr. Lowry continued into May 2019, during which time Dr. Lowry advised that he would speak to leadership about the inequity.

63.     On May 26, 2019, Dr. Maani-Fogelman was told to wait two months for Guthrie to assess her performance; and on May 30, 2019, she was offered a $100,000 forgivable loan with a five-year commitment, which Dr. Maani-Fogelman was compelled to decline out of concern for being locked in for 5 years.

64.     Despite these inequities and clear differential and unfair treatment, Dr. Maani-Fogelman devoted herself to the Medical Director position and immediately excelled in her new role.

65.     During the months of April and May 2019, Dr. Maani-Fogelman successfully built EMR templates for comprehensive palliative care orders, comfort care order protocol, inpatient hospice admission order set, documentation templates for consult, progress notes, and family meetings.

66.     Dr. Maani-Fogelman also engaged in several other discussions with Guthrie in May 2019 regarding outstanding issues and her ideas to improve the Company.

67.     On May 28 and 29, 2019, Dr. Maani-Fogelman submitted paperwork to Guthrie leadership for a proposed business plan, gap analysis, and assessment of needs.

68.     Throughout June, July and August 2019, Dr. Maani-Fogelman engaged in several meetings and needs assessments regarding improvements needed at Guthrie palliative care.

69.     Dr. Maani-Fogelman continued to advocate for herself with respect to the improper salary inequity between herself and male employees.

70.     During a meeting on May 24, 2019 with Dr. Lowry, Dr. Maani-Fogelman again raised the issue of her inappropriately lowered compensation.

71.     On May 30, 2019, she was informed that she had to be at Guthrie for at least six (6) months before any salary adjustments would be considered for Guthrie to see her data and work effort.

72.     Around this time, however, in May 2019, Dr. Maani-Fogelman was contacted by her former employer, requesting that she return to their employ in a newly created position, at a base salary equal to the one given to her by Guthrie.

73.     When Guthrie became aware of this offer, they requested that she wait to make a decision to give them time to configure an improvement in her compensation.

74.     Dr. Maani-Fogelman agreed to do so, but Guthrie never made such an improvement.

75.     In 2020, Dr. Maani-Fogelman was directed to reach out to certain members of Guthrie leadership to see if they could advocate for her to improve her compensation package.

76.     After doing so, she was admonished for "soliciting feedback from leadership," despite having been specifically directed to do so.

77.     Against this backdrop of repeatedly seeking compensation commensurate with her skill level, expertise and experience, Dr. Maani-Fogelman faced significant challenges in finding suitable housing in the area – which she moved to solely for her employment with Guthrie, leading to significant personal difficulties and unanticipated expenses.

78.     Despite these issues, Dr. Maani-Fogelman continued to excel in her role.

79.     The volume at the Sayre facility was extremely high.

80.     Dr. Maani-Fogelman's position was supposed to be 50% administrative, but she was compelled to perform 100% of the clinical work, as well as doing administrative work and working 150% to 200% of her FTE expectations.

81.     Her hard work and dedication did not go unnoticed by others.

82.     In an August 23, 2019 email reply to Dr. Maani-Fogelman, Dr. Jacob Strand, MD, Chair, Enterprise Center for Palliative Medicine, Mayo Clinic, stated that: "this is really impressive data. You are doing a ton of work with very little staff. I think that the metrics you are reporting on are also really impressive for the size of the program, frankly impressive for any size."

83.     In another example of the recognition of Dr. Maani-Fogelman's excellence in her work performance, on August 29, 2019, a patient's son commended Dr. Maani-Fogelman for ensuring that his mother's death was dignified and comfortable, and that Guthrie was lucky to have her.

84.     On November 16, 2019, Dr. Maani-Fogelman received an email from Dr. Lowry referring to her as "strong leadership."

85.     Dr. Maani-Fogelman was also informed by the new Guthrie CEO Dr. Sabanegh, who joined Guthrie in or about January 2022, that Guthrie was lucky to have her and that he was happy that she had brought national attention due to the excellent work she was doing at Guthrie.

86.     In June 2019, Dr. Maani-Fogelman was informed that, despite being the Medical Director for Palliative Care, although Dr. Perle worked in Palliative Care, she was not to manage, discipline or otherwise instruct him because he was a physician and should only answer to other physicians – not a nurse.

87.     Notably, however, Dr. Perle was unable to work respectfully with a team (and, in particular, a new team member who requested not to work with him anymore), compelling Dr. Maani-Fogelman to email Dr. Lowry and Operations Manager Michelle Larrabee in January 2022 with this issue since she was not permitted to "manage a physician."

88.     Dr. Maani-Fogelman continued to express her concerns about the significant salary inequity throughout her employment with Guthrie.

89.     This included, among others, a meeting with Dr. Lowry on September 13, 2019, a meeting with Ms. Larrabee on September 23, 2019, and a meeting request for Dr. Lowry and Ms. Larrabee on October 8, 2019 (although no meeting was ever scheduled).

90.     On October 9, 2021, Dr. Maani-Fogelman met with Dr. Lowry and Catherine Mohr, DNP Chief Nursing Officer for Guthrie, and was assured that they would speak with executive leaders regarding support to improve her compensation, but nothing came of this meeting.

91.     Dr. Maani-Fogelman specifically noted her concerns about gender and racial motivations with regard to the salary inequity in an email to Dr. Lowry on December 9, 2019.

92.     Although Dr. Lowry abruptly dismissed her concerns regarding discrimination to claim that the inequity was simply due to her not being a "physician," it is telling that Dr. Maani-Fogelman was the only female Medical Director and the only non-Caucasian female in leadership at Guthrie at that time.

93.     It is clear that Dr. Maani-Fogelman was treated much differently – and significantly underpaid, with worse benefits and vacation time – than her Caucasian and male colleagues.

94.     In addition, on August 22, 2019, Dr. Maani-Fogelman again emailed Dr. Lowry to complain that she was not being given the same benefits package as others in a Medical Director role, including access to a deferred compensation retirement plan.

95.     Dr. Maani-Fogelman also asked in the email about her anticipated 6-month performance review, since Dr. Bloom had indicated that the review was needed for her to obtain a salary increase.

96.     At a meeting on October 8, 2019, however, Dr. Maani- Fogelman was informed that, contrary to his prior representations of employment of 6 months for a salary adjustment, Dr. Bloom now stated that she had to be employed for at least 9 months to one year for her salary to be adjusted.

97.     The stress of the pay inequity continued to cause issues with Dr. Maani-Fogelman's mental health, personal finances and marital relationship.

98.     Dr. Maani-Fogelman informed Andrea Campbell of these issues at her 6-month retention interview on October 24, 2019.

99.     Dr. Maani-Fogelman was thus compelled to submit a letter to the compensation committee, asking for them to reconsider offering the $100,000 forgivable lean due to the increased expenses Dr. Maani-Fogelman had incurred in attempting to build a home for her new employment at Guthrie. Her request was denied.

100.     Dr. Maani-Fogelman also experienced significant difficulty and hardship with respect to getting the bonuses that had been promised to her as part of her compensation package to induce her to leave her stable and lucrative employment to join Guthrie.

101.     As noted above, as part of her compensation package, Dr. Maani-Fogelman was guaranteed certain bonuses.

102.     However, in early 2020, Dr. Maani-Fogelman asked about the retention bonus and the guaranteed clinical bonus, such as when and how it would be paid.

103.     Initially, no one responded to her inquiry.

104.     After some time, Dr. Maani-Fogelman was informed that she would have to fill out several forms with goals documented to demonstrate how she had earned the bonuses.

105.     Notwithstanding the fact that these bonuses were part of Dr. Maani-Fogelman's guaranteed compensation package as set forth in her Employment Agreement, by the end of February, Dr. Maani-Fogelman had submitted two different forms, the substantiation of her work, achieved metrics and accomplishments, including curriculums for residents and nurses, textbook chapter publication, article publications, and provider feedbacks, in an effort to demonstrate entitlement to her guaranteed bonus.

106.     On January 28, 2020, Dr. Maani-Fogelman had a telephone call with Dr. Lowry, during which, among other things, she reiterated her compensation needs and concerns regarding salary inequity, and inquired as to when she would be paid her guaranteed bonuses.

107.     Dr. Lowry responded that he did not know.

108.     Dr. Maani-Fogelman did receive her $10,000 retention bonus in February 2020, but not her clinical bonus.

109.     Accordingly, on March 2, 2020, Dr. Maani-Fogelman emailed Dr. Lowry with the information regarding her annual review, accomplished goals, and other forms that demonstrated her extreme value to Guthrie, requesting fair compensation and to be paid her guaranteed bonuses.

110.     This information was again resubmitted on March 6, 2020. Dr. Maani-Fogelman repeatedly asked for the status of her clinical bonus at the end of March and continuing in April, but received no response.

111.     Although a meeting was held on April 11 with Ms. Larrabee to work on her "goals" for the bonus, in late April 2020, Dr. Maani-Fogelman was told that she would not be given her promised and guaranteed clinical bonus.

112.     This despite the fact that it was a guaranteed part of her compensation that was promised in order to induce her to accept employment with Guthrie, and upon which she reasonably relied, and despite the fact that she more than amply earned the bonus with her hard work and dedication.

113.     Guthrie was extremely busy in palliative volumes during the Covid pandemic, particularly during the early months of the virus, and Dr. Maani-Fogelman contributed heavily to ensure that Guthrie properly responded to, managed, and thrived during those hectic times of the surging pandemic.

114.     Since the beginning of the pandemic in March 2020, Dr. Maani-Fogelman developed and distributed a system wide policy and protocol for the Covid surge crisis with patient criteria for scarce resource allocation; developed a Covid curriculum with talking maps and communication guides for residents; prepared nursing information graphics for caring for Covid patients; and created a pocket guide or end of life Covid care informational.

115.     She also partnered with nursing managers to assist with Covid patient rapid consultation and consistently dealt with fractured ICU teams, resignations of staff and reduced hours of staff. Dr. Maani-Fogelman stepped up to bridge the ICU staffing gap presence in ICU and Covid units, rounded with residents and nurses to identify Covid patients in need of

palliative care and discussed goals with lucid patients, reviewed ICU documents and initiated

contact with families, did Zoom family conferences, and addressed code status, goals of care and

provided clinical updates. She managed all end-of-life care for Covid cases.

116.     She partnered with the largest area nursing home to provide support for Covid-

positive patient symptom management and saw Covid-positive patients brought to the hospital

for further evaluation and treatment.

117.     Dr. Maani-Fogelman also initiated comfort care and end-of-life protocols when

necessary for these patients.

118.     She managed all communication responsibilities with Covid patients' families,

including the coordination of family meetings to discuss ongoing care and evolution in the

change of their care plans.

119.     She provided the nursing home with material and resources for caring for Covid

patients, including guidelines for symptom management and end-of-life care.

120.     Moreover, in the Fall of 2020, at the specific request of Guthrie, Dr. Maani-

Fogelman provided a Guthrie nursing facility with Covid-related education, resources and

material for providing Covid care to patients, provided a talking map and communication

guidelines for initiating goals of care conversations about Covid, and assisted the social worker

with communications to discuss goals of care.

121.     She also developed and implemented a communication goals of care template for

the EMR, which was shared with the nursing facility staff.

122.     Dr. Maani-Fogelman was on call for all Covid-related consultation and

departmental related support on a 24/7 basis, which included holidays, weekends and vacation.

123.     She worked from home on weekends and evenings, doing telemedicine consultation for Covid cases and Zoom-based family meetings for families of Covid patients to discuss goals of care.

124.     Despite her outstanding credentials and expertise, Dr. Maani-Fogelman's efforts and hard work were overlooked and minimized by Guthrie.

125.     Dr. Bloom stated that Dr. Maani-Fogelman had achieved "way more than they thought" she could do, which was, to them, "impressive" given that she was "just a nurse."

126.     This was not a compliment, and it is highly unlikely that this comment would have been made to a male Medical Director who performed the work that Dr. Maani-Fogelman did.

127.     Additionally, in Spring of 2020 at a Guthrie medical group meeting, Dr. Bloom thanked specific providers for going above and beyond in Covid care, but did not acknowledge any of the efforts, hard work and contributions made by Dr. Maani-Fogelman.

128.     This was typical of Dr. Maani-Fogelman's treatment while at Guthrie at the hands of Dr. Bloom and others in senior leadership.

129.     When Dr. Maani-Fogelman shared her publications, blogs, podcasts and book chapters, the majority of which was at a national level, her accomplishments were rarely recognized while lesser accomplishments of Caucasian and male employees were lauded and publicized.

130.     Dr. Maani-Fogelman again raised her concerns regarding her unpaid but guaranteed clinical bonus in emails on August 13, 2020, noting that she required the additional compensation due to her personal financial needs and the stress that it had taken on her and her marital relationship.

131.     Dr. Maani-Fogelman was informed that month that Dr. Bloom told Dr. Lowry that because he had not engaged in any discussions directly with Dr. Maani-Fogelman regarding her compensation, even though the promises made by Dr. Lowry had been sanctioned by leadership, he did not "owe her anything."

132.     Dr. Maani-Fogelman was informed that Guthrie leadership would meet to discuss her guaranteed clinical bonus, and again requested consultation volumes, satisfaction metrics, provider satisfaction metrics and other metrics to justify the grant of a bonus to Dr. Maani-Fogelman, which she again provided.

133.     Nevertheless, Dr. Maani-Fogelman was informed that her salary was "fair for a nurse practitioner," and there would be "no bonus, no raise," and "no further consideration."

134.     It is noteworthy that the clinical bonus was unquestionably promised and guaranteed, and made to induce Dr. Maani-Fogelman to accept employment with Guthrie, and yet, even after demonstrating that she had earned the bonus, she was told that she would not be getting it.

135.     It is further note-worthy that Dr. Maani-Fogelman was referred to as only a "nurse practitioner" to justify her low salary, when she was not working as a nurse practitioner, but as a Medical Director.

136.     Dr. Maani-Fogelman met with newly-appointed Guthrie CEO Dr. Sabanegh on or about January 21, 2021, shortly after his arrival at Guthrie.

137.     At this meeting, the agenda included, among other things, an introduction to Palliative Medicine at Guthrie; a review of the progress, trends and future growth needs of Guthrie; recruitment; accomplishments; national engagements; Covid work; and Dr. Maani-Fogelman's concerns of inequity and discrimination at Guthrie.

138.    Also in January 2021, at a meeting with Dr. Lowry during which he stated that she was doing her work beautifully, Dr. Maani-Fogelman advised him that he needed to ensure that she got both her retention bonus and clinical bonus as well as a raise that year.

139.    The following month, on February 3, 2021, Dr. Maani-Fogelman again met with Dr. Lowry to review her compensation and stated that she required a base salary of $200,00.

140.    Dr. Lowry requested two months and Dr. Maani-Fogelman agreed.

141.    Dr. Maani-Fogelman then learned that Dr. Bloom did not feel that she deserved the bonus, even though it was guaranteed in her contract, and the perception was that she was too "aggressive" in seeking an augmented salary.

142.    Dr. Lowry thus advised that Dr. Maani-Fogelman put together the data and reports and let other individuals within Guthrie advocate for changes on her behalf.

143.    In March 2021, Dr. Maani-Fogelman requested a performance review, with no response, and emailed regarding the salary inequity issue, to be told that her persistence in seeking fair compensation had been "off putting" to leadership.

144.    On June 1, 2021, Dr. Maani-Fogelman received a letter indicating that she was being given a minor salary adjustment, from a base salary of $159,999 to $163,199.96, with an incentive opportunity of $25,000.

145.    Thereafter, Dr. Bloom engaged in acts designed to further harass and discriminate against Dr. Maani-Fogelman and retaliate against her for her complaints of discrimination and harassment.

146.    In November 2021, Dr. Maani-Fogelman was informed that an investigation had been performed regarding her time attestation for an ICU consult, at the behest of Dr. Bloom;

this was likely an attempt by Dr. Bloom trying to teach Dr. Maani-Fogelman a lesson, which backfired when they found nothing wrong.

147.     In November and December of 2021, Dr. Maani-Fogelman engaged in discussions with Guthrie regarding the need for help, as acuity and volumes were high and the team was burning out from the Covid surge crisis.

148.     She was then falsely accused of burning out her team members, particularly Wanda, and was told that she had been giving additional daily work to Wanda while focusing on national work.

149.     Dr. Maani-Fogelman sought the productivity metrics regarding their work, which demonstrated that Dr. Maani-Fogelman was working at full capacity on her daily work and had not given any of her work to Wanda.  In fact, Dr. Maani-Fogelman was seeing nearly 97% of the same volume at her 0.5 FTE clinical role as the 1.0 FTE clinician, plus Dr. Maani-Fogelman also had her 0.5 FTE leadership role.

150.     In addition, Dr. Maani-Fogelman heard that Dr. Bloom and Dr. Lowry were seeking to terminate her, which Human Resources denied.

151.     She met with Dr. Lowry, who stated that he was burnt out; and, per the request of Dr. Sabanegh, met with Dr. Bloom to discuss her compensation, who stated that he did not make compensation decisions and abruptly left the meeting.

152.     On May 11, 2022, Dr. Maani-Fogelman met with Stacey Thompson, MHA, Executive Vice President and Chief Operating Officer of the Guthrie Medical Group, Lisa Grazul, Vice President, Operations/Oncology Service Line, and Ms. Larrabee, trying to make a case for their advocacy as women in leadership to help improve her situation.

153.    Among other things, she was told that she needed to request a compensation review with Dr. Scalzone and Dr. Bloom, who were both senior members of the compensation committee.

154.    Dr. Maani-Fogelman did so that very day.

155.    She received a response from Dr. Scalzone that her note was received and would be presented "at a future compensation committee meeting."

156.    By June 22, 2022, however, exactly six (6) weeks later, Dr. Maani-Fogelman still had not received any notice of a meeting or any information regarding her request for fair compensation.

157.    It became clear to Dr. Maani-Fogelman that the males "stuck together" to support each other, and particularly, Dr. Scalzone, Dr. Bloom, and Dr. Perle, which contributed to the significant salary inequities between the males and Dr. Maani-Fogelman.

158.    By way of just one example, Dr. Perle performed one-third to one-half of the work that Dr. Maani-Fogelman performed during her employment with Guthrie, but Dr. Perle, a Caucasian male, earned over $100,000 more each year.

159.    Although Dr. Perle himself did not directly engage in the discrimination, harassment or retaliation against Dr. Maani-Fogelman, as he worked for her, the treatment afforded to him, a Caucasian male, is in stark contrast to and is very telling of the discriminatory animus held by the other Caucasian males at Guthrie.

160.    It was further clear to Dr. Maani-Fogelman that the discrimination, harassment, and retaliation would continue without abatement and without any recourse for her.

161.    She was then compelled to submit her resignation, being constructively discharged, with a final day of employment of August 23, 2022.

162.    Dr. Maani-Fogelman was not paid or treated fairly or appropriately during her employment with Guthrie on the basis of her sex and race.

163.    She was repeatedly turned down when she requested that Guthrie make her compensation equitable and simply in line with national standards for irrelevant reasons such as that she was "not a doctor" or was the "highest paid nurse practitioner."

164.    In fact, Dr. Maani-Fogelman has a doctorate from Columbia University with a 3.99 GPA and more than 15 years of experience in palliative care.

165.    She is Board Certified in Palliative and Hospice medicine as well as family/adult practice.

166.    Moreover, regardless of whether Dr. Maani-Fogelman had credentials of a nurse practitioner or a physician, Dr. Maani-Fogelman was not hired or acting as a Nurse Practitioner – she was hired as, and performed the role of, a Medical Director.

167.    Most tellingly, she was the lowest paid Medical Director at Guthrie and her benefit package aligned with those of a staff Nurse Practitioner; it was not commensurate with that of a Medical Director - her actual role.

168.    She was given entry level two weeks' vacation and the educational allowance of a staff nurse practitioner.

169.    She was not given access to any retirement plans made available to leadership positions at the Medical Director level, was not compensated at a Director level, and her attempts to pursue equity and fairness were ignored and discarded.

170.    Indeed, while Dr. Maani-Fogelman was hostilely called "aggressive" or "persistent" for seeking to ensure that her pay was commensurate with her skill and expertise,

various male providers who sought improved compensation were never dubbed "aggressive" or "persistent."

171.    Put simply, despite being hired as a Medical Director, and successfully fulfilling the role of Medical Director, because of her sex and race, Dr. Maani-Fogelman was not treated as one.

172.    Notably, the discriminatory and unfair treatment based on sex was not limited to Dr. Maani-Fogelman.

173.    Two female physicians at Guthrie resigned after learning that a newer male physician was earning over $100,000 more than both of them; and when they complained about the discrepancy to Dr. Bloom, he stated that that was the salary that they had negotiated for themselves.

174.    The significant discrepancy in pay and treatment experienced by Dr. Maani-Fogelman is particularly concerning given that Dr. Maani-Fogelman had not sought employment at Guthrie.

175.    Guthrie sought her out based on her exceptional skill, experience and expertise. She was hired as the strongest candidate with the most relevant experience in palliative medicine and program building for palliative medicine.

176.    After meeting with the CFO, Dr. Maani-Fogelman learned that her contribution in length of stay reduction led to a savings of approximately $700,000 to Guthrie.

177.    In the three years of her employment at Guthrie, she exceeded all goals set for her even before they were due.

178.    Dr. Maani-Fogelman's contributions to Guthrie in building a strong, thriving and successful palliative medicine program were outstanding: she tripled the consult volume; more

than doubled gross revenue; had been sought out as an expert in the field of palliative medicine and frequently gave advice on patient situations, both formally and informally; she built strong relationships with the Guthrie clinical stakeholders that were nonexistent prior to her employment, but which has now created an integrated presence in the critical care unit; her research and continued efforts lead to the initiation of a research protocol called "exit Covid-19"; she made notable outreach efforts to improve patient and community engagement in palliative medicine; she was a sub investigator for the experimental protocol; she is a nationally known entity in rural palliative care with her own podcast with the American Thoracic Society about pulmonary-palliative care; she increased awareness of programs, revamped and redefined brochures and handouts for patients, colleagues and community and made postings on the internal Facebook site to improve understanding and awareness about palliative medicine.

179.     In addition, and among other things, Dr. Maani-Fogelman also reviewed the palliative care business plan, developed the system-wide Covid surge crisis response policy and scarce resource allocation protocol, and made presentations to senior leadership about program volume, growth to date, outcome and recommendation for staff.

180.     She was designated as one of the system triage officers for surge crisis.

181.     In fact, Dr. Maani-Fogelman was an instrumental and integral part of Guthrie's response to the Covid crisis.

182.     Without her palliative medicine efforts, resources and integration, as well as her educational efforts on Covid communication, Covid symptom management, and assistance to the outside organization such as area nursing homes and the Guthrie owned nursing facility, Guthrie's Covid-related volumes would have been unmanageable, as there would have been no

preemptive goals of care discussion and no formal documentation of a plan of care in the event of high-risk patients with worsening Covid.

183.    It is only due to Dr. Maani-Fogelman's efforts that patients who were suffering with Covid did not die a horrible death in this organization and that their families felt supported and reassured as best possible through such a difficult process in the time of a global pandemic.

184.    It is also entirely Dr. Maani-Fogelman's doing that there is a systemwide Covid-related crisis policy in effect at Guthrie, which she wrote in its entirety and without the assistance of any input from anyone at Guthrie.

185.    In being induced to accept employment at Guthrie, based on the promises and representations made to her, Dr. Maani-Fogelman gave up a house that was paid off and in a highly desirable neighborhood, no debt, and a job she loved. She had a healthy and happy relationship with her spouse.

186.    However, due to the several broken promises, financial inequities, compensation injustice, and the failure of Guthrie to treat her with fairness and equity, Dr. Maani-Fogelman was forced to use her savings to build a new home and dealt with significant anger, tension and incessant arguing in her marital relationship, which took an extremely negative impact on her mental health; while dealing with multiple Covid surges with minimal staff, no secretarial support, no resources for optimizing well-being or mitigating burnout, being on call 24/7 for Covid consults, and dealing with repeated acts of discrimination and harassment on the basis of her sex and race, and retaliation for her complaints of the discrimination and harassment.

187.    In another instance of the discrimination, harassment and retaliation to which Dr. Maani-Fogelman was subjected to at Guthrie, after submitting her resignation due to such discrimination, harassment and retaliation, and due to having been subjected to gross inequality

despite her tremendous accomplishments, as detailed above, Dr. Maani-Fogelman emailed Dr. Bloom on July 7, 2022 regarding her expected and earned bonus for Fiscal Year 2022, which was to be paid out prior to her last day of employment.

188.    In this email, Dr. Maani-Fogelman submitted her FY22 Goal Development form and indicated that her last day of employment with Guthrie would be August 23, 2022, and that she understood that the bonuses, which she had fully earned by exceeding the expectations set forth for her, through her diligence, hard work and performance, would be paid out in August 2022.

189.    In response, Dr. Bloom - again – denied Dr. Maani-Fogelman her earned bonus, now claiming that she could not receive her bonus because she had resigned, even though the bonus would be paid out while she was still at Guthrie, citing an alleged Guthrie policy that had never been given to or explained to Dr. Maani-Fogelman.

190.    The lack of any legitimate justification for Guthrie's actions, including the significant disparity in pay between Dr. Maani-Fogelman and her Caucasian male colleagues and the refusal to pay Dr. Maani-Fogelman her rightfully earned wages, indicates that the real reason for Guthrie's treatment of Dr. Maani-Fogelman was discrimination and retaliation for her complaints of discrimination.

191.    Despite her loyalty, dedication and consistently excellent performance, and given her treatment during her employment with Guthrie, Dr. Maani-Fogelman maintains that Guthrie discriminated against her on the basis of her sex and race and retaliated against her for her complaints about discrimination.

192.    Defendant discriminated against and harassed Dr. Maani-Fogelman because of her sex and race – including by refusing to pay Dr. Maani-Fogelman a salary that was

commensurate with her skills, experience, and position as a Director while paying her Caucasian male coworkers a higher salary despite them performing less work in a non-director position and by refusing to pay Dr. Maani-Fogelman her rightfully earned wages – and retaliated against Dr. Maani-Fogelman for complaining of the discrimination and harassment, in violation of Title VII, the WPCL, and the EPA.

193.    Defendant willfully violated Title VII, the WPCL, and the EPA, as Defendant knew that its actions violated the statutes and/or acted with reckless disregard as to whether its actions violated Title VII, the WPCL, and the EPA.

194.    By convincing Dr. Maani-Fogelman to accept employment with Defendant, and to leave her previous, lucrative employment based upon representations that the Defendant knew were false at the time they made them to Dr. Maani-Fogelman, Defendant fraudulently induced Dr. Maani-Fogelman to leave her prior employment, forego other favorable offers, and accept employment with Defendant.

195.    By failing to provide Dr. Maani-Fogelman with the bonuses it had promised, Defendant breached its contract with Dr. Maani-Fogelman.

196.    As a result of the discrimination, harassment, retaliation and other wrongful conduct perpetrated against Dr. Maani-Fogelman by Guthrie, Dr. Maani-Fogelman has suffered significant financial losses including, among other things, loss of employment and loss of wages.

197.    Dr. Maani-Fogelman has suffered significant financial loss, harm to her reputation in the community and other harm and damages as a direct and proximate result of the actions and inactions of the Defendant.

198.    As a result of Defendant's conduct described herein, Dr. Maani-Fogelman has suffered and continues to suffer significant emotional distress and hardship.

199.     Dr. Maani-Fogelman has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendant.

200.     Defendant and its agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Dr. Maani-Fogelman to suffer emotional distress.

201.     As a result of the Defendant's conduct described herein, Dr. Maani-Fogelman has incurred a significant obligation for attorneys' fees and costs of bringing this action.

## COUNT I
### Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), et seq.

202.     Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

203.     Based on the foregoing, Defendant Guthrie Medical Group PC engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

204.     In discriminating against and harassing Dr. Maani-Fogelman because of her sex and race, and in retaliating against Dr. Maani-Fogelman for her complaints of discrimination and harassment, Defendant violated Title VII.

205.     Defendant's violations were intentional and willful.

206.     Defendant's violations warrant the imposition of punitive damages.

207.     As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant Guthrie Medical Group PC, Plaintiff Patricia Maani-Fogelman has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

29

## COUNT II
### Pennsylvania Wage Payment and Collection Law

208.    Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

209.    Dr. Maani-Fogelman's bonuses constitute earned wages within the meaning of the WPCL.

210.    Defendant Guthrie Medical Group PC violated the WPCL by failing to pay Dr. Maani-Fogelman her earned bonuses, including claiming that Dr. Maani-Fogelman's bonus for FY 2022 was forfeited due to her resignation, and failing to pay Dr. Maani-Fogelman her earned wages within the time specified by law.

211.    At all relevant times, Defendant Guthrie Medical Group PC was an employer within the meaning of 43 Pa. C.S. 260.2(a) of the WPCL.

212.    Defendant willfully failed to pay Dr. Maani-Fogelman her wages as defined by the WPCL earned during the course of her employment within the time limits prescribed by the WPCL.

213.    As the direct and proximate result of the aforesaid violation of the Pennsylvania Wage Payment and Collection Law, Plaintiff Patricia Maani-Fogelman has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

## COUNT III
### Equal Pay Act, 29 U.S.C. § 206(d)

214.    Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

30

215.     Defendant Guthrie Medical Group PC violated the Equal Pay Act, 29 U.S.C. § 206(d), by paying wages to Dr. Maani-Fogelman, a woman, at rates less than the rates it pays male employees in the same establishment for equal work on jobs requiring equal skill, effort and responsibility, and performed under similar working conditions.

216.     Defendant Guthrie Medical Group PC willfully violated the Equal Pay Act.

217.     Defendant Guthrie Medical Group PC's violations of the Equal Pay Act were not in good faith.

218.     Defendant Guthrie Medical Group PC did not have reasonable grounds to believe that its acts or omissions were not violations of the Equal Pay Act.

219.     As a result of Defendant Guthrie Medical Group PC's violations of the Equal Pay Act, Dr. Maani-Fogelman is entitled to an award of liquidated damages.

220.     As the direct and proximate result of the aforesaid violation of the Equal Pay Act, Plaintiff Patricia Maani-Fogelman has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

### COUNT IV
**Breach of Contract**

221.     Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

222.     Defendant Guthrie Medical Group PC entered into a contract with Dr. Maani-Fogelman wherein it agreed to pay Dr. Maani-Fogelman certain guaranteed bonuses every year of her employment.

223.     Defendant Guthrie Medical Group PC breached its contract with Dr. Maani-Fogelman as alleged herein.

224.   Dr. Maani-Fogelman seeks damages for Defendant Guthrie Medical Group PC's breaches of the aforementioned contract.

225.   Defendant Guthrie Medical Group PC's conduct is without excuse or justification.

**COUNT V**
**Fraudulent Inducement**

226.   Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

227.   Defendant Guthrie Medical Group PC fraudulently induced Dr. Maani-Fogelman to accept employment with Defendant based on the fraudulent promises of certain annual compensation and guaranteed bonuses.

228.   At the time Defendant Guthrie Medical Group PC made the above representations, it did not intend to abide by the representations it had made.

229.   The misrepresentations made by Defendant were fraudulent.

230.   The misrepresentations made by Defendant were of material facts.

231.   Plaintiff relied on the false and/or misleading statements, conduct and representations of Defendant and sustained the losses and damages as previously set forth herein.

232.   The misrepresentations by Defendant induced Plaintiff to leave a lucrative position and forego other very favorable offers.

233.   Defendant intended that Plaintiff would rely upon the misrepresentations.

**PRAYER FOR RELIEF**

234.   Plaintiff Patricia Maani-Fogelman repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Patricia Maani-Fogelman respectfully requests that this Court enter judgment in her favor and against Defendant Guthrie Medical Group PC and Order:

a.   Appropriate equitable relief;

b.   Defendant to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination, harassment and retaliation;

c.   Defendant to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

d.   Defendant to compensate Plaintiff with the value of her bonus lost because of Defendant's unlawful conduct;

e.   Defendant to pay Plaintiff punitive damages;

f.   Defendant to pay Plaintiff liquidated damages;

g.   Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

h.   Defendant to pay Plaintiff's costs of bringing this action and her attorneys' fees;

i.   Plaintiff be granted any and all other remedies available pursuant to Title VII, the WPCL, the EPA, and Pennsylvania common law; and

j.   Such other and further relief as is deemed just and proper.

## **JURY DEMAND**

Plaintiff Patricia Maani-Fogelman hereby demands trial by jury as to all issues so triable.


By:  */s/ Christopher A. Macey, Jr.*
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff*
*Patricia Maani-Fogelman*


Dated: April 12, 2023